# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COLONIAL SCHOOL DISTRICT,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **N.S., *et al,*** | : | **No. 19-1311** |
| *Defendants* | : | |

## M E M O R A N D U M

PRATTER, J.                                                                        MARCH 27, 2020

After conducting a special education due process hearing, an administrative hearing officer determined that Colonial School District failed to provide N.S., an elementary school student, a free appropriate public education (FAPE) in violation of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et. seq.*, from March 16, 2017 to the end of the 2017-2018 school year. The hearing officer awarded N.S. compensatory education hours and her parents a reimbursement of expenses related to her eventual placement at a private school equipped to meet her needs.

As permitted under the IDEA, Colonial now challenges the hearing officer's determination. Both parties have filed cross-motions for judgment on the administrative record. For the reasons set forth in this Memorandum, the Court will grant in part and deny in part both motions and affirm in part and reverse in part the hearing officer's decision. Because the Court finds that Colonial denied N.S. a FAPE, it awards N.S. and her parents[1] appropriate relief.

---

[1]     N.S., represented by and through her parents, is named as a defendant in this case. For simplicity's sake, the Court will refer to N.S. and her parents collectively as "the parents."

1

## I.    Factual Background[3]

N.S. is a late pre-teen who resided in Colonial School District from the start of the 2015-2016 school year, her third-grade year, until August 2019, the end of her sixth-grade year. HOD at ¶ 1. N.S. attended Woodlynde, a private school, during the 2018-2019 school year. *Id.* Although N.S. has tried various medications for her Attention Deficit Hyperactivity Disorder (ADHD), none have been consistently effective over the long term. HOD at ¶ 2. Given N.S.'s symptoms related to her ADHD, anxiety, and other diagnoses which affect her ability to make academic progress, HOD at ¶ 3, N.S. is eligible for special education under the IDEA as a child with a "specific learning disability" and "other health impairment," HOD at ¶ 1.[4]

---

[2]    The administrative record submitted to the Court contains documents with different labeling schemes. The Court will refer to documents in the following manner: "HOD" refers to the hearing officer's decision; "P-" refers to the parents' exhibits admitted in the due process hearing; "S-" refers to Colonial's exhibits admitted in the due process hearing; and "N.T." refers to the Notes of Testimony from the underlying due process hearing.

[3]    When a district court reviews an agency decision under the IDEA, "[f]actual findings from the administrative proceedings are to be considered *prima facie* correct." *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). The court will defer to the hearing officer's credibility judgments and factual findings unless it can point to contrary nontestimonial, extrinsic evidence in the record that justifies a contrary conclusion. *Id.* Accordingly, the Court's account of the facts here is largely based upon the hearing officer's factual findings as described in her written decision. To the extent that the Court supplements this account with additional facts in further support of the hearing officer's factual findings, it cites the documents upon which it relies.
   The hearing officer provided comprehensive details concerning the findings set forth in N.S.'s initial evaluation report, her January 2018 reevaluation report, and her May 2018 psychiatric evaluation report. The hearing officer also details the terms of N.S.'s IEPs and her progress monitoring. HOD at ¶¶ 6-14, 16, 24-26, 29, 30, 44, 53-56, 62-67, 72, 75, 78-81. Because as to these determinations the hearing officer set out appropriate support and explanation, the Court affirms these factual findings. For the sake of brevity, the Court does not reproduce every detail concerning these factual findings in this Memorandum.

[4]    N.S.'s "emotional disturbance based on anxiety" has also been suggested as a basis for N.S.'s eligibility for special education. HOD at ¶ 1.

**A. 2015-2016 School Year (Third Grade)**

The parents moved into Colonial School District at the beginning of N.S.'s 2015-2016 third-grade year. HOD at ¶ 4. N.S.'s former school district had sought and obtained parental consent to evaluate N.S. *Id.* In response to N.S.'s prior school's concern over N.S.'s reading, writing, and mathematical skills and her difficulty maintaining attention and focus, Colonial obtained parental consent to evaluate N.S. in the fall of 2015. HOD at ¶ 5. N.S.'s initial evaluation was based on parental input, teacher input, academic levels, a cognitive assessment, an academic achievement assessment, rating scales, and behavior assessments. HOD at ¶¶ 6, 8-14. The evaluation report concerning N.S. was issued in October 2015. HOD at ¶ 5. It reflected, among other things, that: (1) N.S.'s previous ADHD diagnosis was not successfully managed by medication, HOD at ¶ 6; (2) N.S. could not complete homework on her own, HOD at ¶ 7; (3) in the classroom, N.S. demonstrated inappropriate peer interactions; made verbal and nonverbal noises and frequent movements; and demonstrated difficulty with paying attention, following directions, and completing tasks without supervision, HOD at ¶ 8; (4) N.S. academically struggled in reading fluency and comprehension, writing, and mathematics, HOD at ¶ 9; and (5) N.S.'s teachers were concerned about her hyperactivity; conduct, attention, and learning problems; aggression; atypicality; withdrawal; study skills; leadership; and functional communication, HOD at ¶ 13.

As a result of the findings detailed in this initial evaluation report, N.S.'s evaluator concluded that N.S. was eligible to receive special education for her "specific learning disability" and "other health impairment." HOD at ¶ 14. In November 2015, Colonial developed N.S.'s initial Individualized Education Program (IEP)[5] identifying her needs for mathematics, written

---

[5]    School districts use IEPs to design and administer programs of individualized instruction. This Memorandum further defines IEPs on page 18.

expression, reading fluency and comprehension, and remaining on task, which were targeted in her IEP's annual goals.[6]  HOD at ¶¶ 15, 16.  The initial IEP proposed a supplemental level of learning support, with N.S. not participating in regular education classes for reading, writing, and mathematics.  HOD at ¶ 17.  The parents approved the IEP by signing a "Notice of Recommended Educational Placement" (NOREP) form.[7]  *Id.*

### B. 2016-2017 School Year (Fourth Grade)

During N.S.'s fourth-grade year, she experienced anxiety over attending school, resulting in missing a number of school days, as well as anxiety about her relationships with peers and staff. HOD at ¶ 20.  She also consistently struggled with finishing homework and exhibited difficulty remaining attentive.  HOD at ¶ 20, 22, 23.  Colonial prepared another IEP for N.S. in November 2016, which noted that N.S. exhibited behaviors that impeded her own learning or that of others.[8] HOD at ¶ 24.  The November 2016 IEP again proposed a supplemental level of learning support without N.S. participating in regular education reading and math classes.  HOD at ¶ 27.  Annual goals identified in this IEP targeted reading, writing, mathematics, and remaining focused on tasks. HOD at ¶ 25.  The November 2016 IEP also included program modifications and items of specially designed instruction, including multisensory phonics instruction, use of checklists and graphic organizers for writing tasks, frequency reminders, preferential seating, and fidget items.  HOD at

---

[6]     The IEP was revised in May 2016 to reflect that N.S. had met one of her annual goals and to increase the expectations for N.S. to a mid-third grade level.  HOD at ¶ 18.

[7]     A NOREP form "is utilized by an educational agency to communicate to parents an action proposed or an action refused."  *Olivia B. v. Sankofa Academy Charter Sch.*, No. 14-867, 2014 WL 5639508, at *1 n. 8 (E.D. Pa. Nov. 4, 2014).

[8]     This note is included in all of N.S.'s subsequent IEPs.  HOD at ¶¶ 53, 78.  Notably, each of these IEPs instructs that if a student exhibits behaviors that impede his or her learning or that of others, "[t]he IEP team *must develop a Positive Behavior Support Plan that is based on a functional assessment of behavior* and that utilizes positive behavior techniques."  S-10 at 4; S-52 at 4; S-62A at 4 (emphasis added).

¶ 26. Although the IEP included a "motivational behavior plan," Colonial did not develop a positive behavior support plan.[9] *Id.* The parents signed a NOREP form to approve the November 2016 IEP. HOD at ¶ 27.

During fourth grade, N.S. was placed in "co-taught" science and writing classes; provided writing support in small groups, as needed; attended mathematics class in a learning support classroom with a special education teacher and instructional aide; and had a 90-minute period of small group and shared reading instruction with a special education teacher in the learning support classroom. HOD at ¶ 29. Although N.S. did not perform well when placed in full classes, she performed "much better" in small groups or one-on-one. HOD at ¶ 31. N.S. particularly struggled with math and reading fluency and comprehension, in part because of her many absences. HOD at ¶¶ 32, 33. Approximately halfway through the school year, N.S. began an additional period of reading support in the learning support classroom. HOD at ¶ 37.

Beginning in late fall 2016, N.S. began participating in a weekly "lunch bunch" social skills group and another small social skills group, both of which were comprised of regular and special education students. HOD at ¶ 35. N.S. also individually met with a school counselor when she became upset or felt as though she needed to talk something through. *Id.* The informal "motivational behavior plan" developed during N.S.'s fourth-grade year consisted of a chart drawn on a dry-erase board that set forth expectations for N.S. to remain focused and on-task, keep her hands and feet to herself, and to tell the truth. HOD at ¶ 41; N.T. at 289:4-9. N.S. earned "points"

_____

[9]     As discussed below, a positive behavior support plan is defined as "[a] plan for students with disabilities and eligible young children who require specific intervention to address behavior that interferes with learning.  A positive behavior support plan shall be developed by the IEP team, be based on a functional behavior assessment, and become part of the individual eligible young child's or student's IEP. These plans must include methods that utilize positive reinforcement and other positive techniques to shape a student's or eligible young child's behavior, ranging from the use of positive verbal statements as a reward for good behavior to specific tangible rewards." 22 Pa. Code 1§ 4.133(b).

for appropriate behavior. *Id.* Although the "points" were tallied daily, N.S.'s fourth-grade teacher erased the points without recording a physical catalog to monitor efficacy. HOD at ¶ 41; N.T. at 291:9-16.

By the middle of her fourth-grade year, N.S. exhibited difficulty with peer relationships and social skills, particularly in unstructured settings, and engaged in inappropriate behaviors toward other students. HOD at ¶ 36. She exhibited aggression, lied, stole others' belongings, and behaved in a sexually-suggestive manner. *Id.* N.S. was also unable to properly interpret the words and actions of others. *Id.* In March 2017, Colonial's behavioral health advisor met with the parents to discuss available community-based behavioral health services and the parents' potential signing of a release form to permit Colonial to communicate with community-based providers about N.S. HOD at ¶ 38. At this meeting, Colonial's school counselor also requested a reevaluation of N.S. given concerns that N.S. had been "struggling behaviorally and emotionally with coming to school[.]" HOD at ¶ 38; S-24 at 1. On March 16, 2017, Colonial requested parental consent to conduct a reevaluation consisting of "achievement testing, parent and teacher input forms, behavior rating scales and classroom observations." S-24 at 2. Colonial did not request parental consent to complete a functional behavioral assessment, as is required in order to develop a positive behavior support plan. *Id.*

The parents expressed concerns to the health advisor about how much personal private information they would have to share. HOD at ¶ 39. They also communicated their mistaken understanding that they would have to consent to release information to private providers in order for N.S. to be reevaluated. *Id.* Accordingly, the parents decided not to consent to the reevaluation. HOD at ¶ 40.[10]

---

[10] The parents also communicated to the school counselor that they were pursuing a private evaluation. HOD at ¶ 40. The parents obtained a private psychiatric evaluation on April 2017. HOD at

N.S.'s progress monitoring for the 2016-2017 school year reflected overall inconsistency across most of her IEP annual goals. HOD at ¶ 44. Pertinent here, the data on N.S.'s goal for remaining on task varied, but ultimately demonstrated that N.S. performed at approximately the same level on her end-of-school-year evaluations as she did on her baseline evaluations. *Id.* N.S. ended the 2016-2017 school year with a total of 47 absences. HOD at ¶ 45. N.S.'s grades were primarily within the "partially proficient" range with a few skills falling within the "proficient" or "not proficient" range. *Id.*

### C. 2017-2018 School Year (Fifth Grade)

During her fifth-grade year, N.S. continued to demonstrate difficulty staying focused and engaging in physically aggressive behavior toward her peers. HOD at ¶ 48. At the beginning of her fifth-grade year, N.S. was suspended for several days because of her problematic behavior on the school bus. HOD at ¶ 46. In early November 2017, N.S. wrote on a white board in the learning support classroom that she wanted to kill herself. HOD at ¶ 50.

N.S.'s fifth-grade behavior chart was similar to the behavior chart used in fourth grade. HOD at ¶ 47. This chart, now recorded on paper, tracked whether and how many prompts N.S. needed to follow directions, use respectful language, and keep her hands to herself as part of a daily and/or weekly point-based incentive system. *Id.* N.S. again participated in a "lunch bunch" social skills group, another social skills group, and met individually with the school counselor as needed. HOD at ¶ 49.

---

43. Although the parents did not share that evaluation report with Colonial, they informed Colonial that N.S. had been diagnosed with ADHD, anxiety, depression, and disruptive mood dysregulation disorder. *Id.*

On November 3 and November 10, 2017, N.S.'s IEP team[11] met and determined that N.S. continued to exhibit difficulties with maintaining focus and attention and sitting still, which required frequent redirection. HOD at ¶ 53. The November 2017 IEP[12] again identified N.S.'s needs and annual goals which focused on following directions and maintaining focus on tasks, mathematics, writing, and reading comprehension. HOD at ¶ 53, 54. Like the IEPs before it, this IEP proposed a supplemental level of learning support without N.S. participating in regular education reading and math classes. HOD at ¶ 56. The November 2017 IEP also repeated the program modifications and items of specially designed instruction included in the November 2016 IEP but added support for organization and small group instruction for reading, mathematics, and social skills. HOD at ¶ 55. Again, there was a "motivational behavior plan" but no positive behavior support plan. *Id.* For the first time, the IEP team discussed private school placement and agreed that "placement in an approved private school" would best meet N.S.'s needs. HOD at ¶ 56; S-52 at 27. Colonial believed that a "reevaluation was necessary" before the IEP team could make an informed decision as to which private school N.S. should attend. HOD at ¶ 58.[13]

Because N.S.'s behavioral concerns remained, including N.S.'s reported suicidal ideation, her difficulty remaining focused, and her sexually-suggestive comments, Colonial requested parental consent to conduct a reevaluation in mid-November 2017. HOD at ¶ 51. Colonial

---

[11]    The "IEP team" is the group of stakeholders—including school staff and the student's family members—that fashions the IEP.

[12]    The IEP has a "DRAFT V2" marking. S-52. At the time, Colonial's IEP-generating computer program was improperly labeling all IEPs as "draft" IEPs. N.T. at 554:10-555:5. Even so, a Colonial official testified that she knew this IEP was the "final" version because it incorporated language added after the IEP meetings took place. *Id.*

[13]    *See also* N.T. at 556:17-557:1 ("In November of 2017 the team discussed that there were concerns about [N.S.], and that we thought that she would benefit more from another school setting, the question remained which one, what were all of her needs. We felt that we needed more information . . . . So we once again said can we please *reevaluate* her to see what we're missing, we think we're missing something.") (testimony of Carole Chasen, Colonial's Supervisor of Special Education) (emphasis added).

proposed the reevaluation as a means "to determine [N.S.]'s current academic, behavioral, executive functioning, and emotional needs to assist the team in planning for all aspects of her education." S-48 at 1. The reevaluation was to consist of the following tests and assessments: "Academic achievement, parent input, teacher input, curriculum[-]based assessment, functional behavior assessment, record review, observations, behavioral and/or social emotional rating scaled, and school-based neuropsychological assessment." *Id.* at 2. The parents provided their consent on or about November 14, which Colonial received on November 27, 2017. HOD at ¶ 51. In early December 2017, Colonial then issued a second form requesting permission to conduct a psychiatric evaluation by a private psychologist, Dr. Lisa Goldstein, "for the purpose of planning an appropriate educational program for [N.S.]." HOD at ¶ 60; S-53 at 2. The parents consented on December 7, 2017. HOD at ¶ 60.

Colonial's school psychologist conducted the reevaluation and issued a reevaluation report on January 25, 2018. HOD at ¶ 61; S-61 at 2. In issuing the reevaluation report, the school psychologist took into consideration parental input; scores from N.S.'s 2015 cognitive assessment; an academic achievement assessment; rating scales; assessments of N.S.'s attention and executive functioning; and her observations of N.S.'s inattention, impulsivity, and off-task behaviors in several settings. HOD at ¶¶ 62-67. The school psychologist concluded that N.S. was not able to accurately interpret many facial expressions and emotions of others, and therefore, demonstrated difficulty perceiving social cues. HOD at ¶ 69. The reevaluation report also reflected N.S.'s below basic range scores on benchmark reading, mathematics, and writing assessments completed in the fall of 2017. HOD at ¶ 68. Accordingly, the school psychologist made a number of recommendations to the IEP team, including a change of placement, a positive behavior support plan, counseling, increased support, and small class sizes with a smaller student-to-teacher ratio.

HOD at ¶ 70. The parents contacted Colonial several times in January, February, and March to discuss implementing the psychologist's various program and placement recommendations. HOD at ¶ 71. As discussed below, the IEP team did not discuss the reevaluation report until months later, after Colonial received Dr. Goldstein's evaluation report. HOD at ¶ 76.

Dr. Goldstein did not provide her report until May 2018.[14] Her report provided diagnoses of ADHD, Tourette's Disorder, Anxiety Disorder (not otherwise specified), specific learning disabilities (reading fluency, math, writing), and tactile defensiveness. HOD at ¶ 75; S-62 at 20-21. Dr. Goldstein's recommendations included focusing on N.S.'s social skills, counseling, accommodations and supports, and a school environment with a low student-to-teacher ratio with a behavior plan. HOD at ¶ 75.

Both the school psychologist's reevaluation report and Dr. Goldstein's psychiatric evaluation report were first discussed at the May 2018 IEP team meeting. HOD at ¶ 76. At the meeting, Dr. Goldstein recommended private school placement for N.S. at a school that could provide small class sizes and a low student-to-teacher ratio. HOD at ¶ 77. The IEP team developed a May 2018 IEP.[15] HOD at ¶ 78. The May 2018 IEP again identified N.S.'s needs and annual goals which targeted following directions and remaining focused to task, mathematics, reading, and writing. HOD at ¶ 78-79. This IEP also repeated past program modifications and items of specially designed instruction and added test and assignment accommodations, limitations on

---

[14]    The psychiatric report is not actually dated. S-62. The report states that Dr. Goldstein evaluated N.S. on February 15, March 14, March 28, and April 25 of 2018. *Id.* Therefore, the report could not have been issued prior to April 25, 2018. Because the Court is to give due weight to the underlying administrative proceedings and because no evidence suggests that the psychiatric report was issued sometime during the last week of April 2018, the Court affirms the hearing officer's logical, or at least, reasonable factual finding that the supplemental psychiatric report was provided to its recipients sometime in May 2018.

[15]    Although, like the November 2017 IEP, the May 2018 IEP had a "DRAFT V2" marking, the document also included language demonstrating that the IEP had been modified after the team meeting took place. S-62A.

unstructured activities, and positive reinforcement and included counseling as a related service. HOD at ¶ 80. Again, no positive behavior support plan was developed. *Id.* The May 2018 IEP once more placed N.S. in supplemental learning support at Colonial without N.S. participating in regular education reading and mathematics classes but noted an agreement to pursue alternate educational placement at a private school. HOD at ¶ 81; S-62A. Colonial did not issue a NOREP form in conjunction with the May 2018 IEP. HOD at ¶ 84.

N.S.'s progress monitoring for the 2017-2018 again reflected inconsistency as to most of her November 2017 IEP goals. HOD at ¶ 72.

### D. Private School Referral and Acceptance

At the May 2018 IEP meeting, the team discussed N.S.'s placement at Woodlynde. N.T. at 541:11-12. Woodlynde is a small, specialized school where students with learning differences are taught by certified teachers. HOD at ¶¶ 96-99. Carole Chasen, Colonial's Supervisor of Special Education, was put into contact with Kristen Tabun, Woodlynde's Director of Enrollment Management, to initiate the referral process. HOD at ¶ 85; N.T. at 497:2-7; S-72 at 5. On May 17, 2018, Ms. Chasen emailed Ms. Tabun that Colonial was seeking alternative placement for N.S. at Woodlynde. S-72 at 3. Ms. Chasen sent a follow-up email to Ms. Tabun on May 29, 2019, *id.*, who responded the next day:

> We [Woodlynde] reviewed the evaluation for [N.S.] and have decided to move forward with our application process. We have requested the remaining application materials from the family (Application, School records, recommendations) and hope to have [N.S.] visit in our summer program before making our final decision.
>
> If you have any other questions, please let me know. We're looking forward to learning more about [N.S.].

*Id.* The following day, Colonial's attorney, via email, replicated the above email and added: "I'm confident Ms. Chasen has already contacted the family. Nonetheless, kindly ask your clients to follow-up with Woodlynde to complete the process." S-63b at 1.

Ms. Chasen promptly responded to Ms. Tabun's email: "Since the District is making the referral, are there things we can do/provide to help facilitate this process?" S-72 at 3. Three days later, Ms. Tabun responded by inquiring whether Colonial could provide (1) a copy of N.S.'s 2017-2018 school records[16] and (2) a recommendation. *Id.* Mses. Chasen and Tabun sent a few emails back and forth, primarily to confirm what was necessary for the recommendation. S-72 at 5-6. Ms. Chasen authored a recommendation letter dated June 13, 2018. *Id.* at 9.[17] The parents and the parents' attorney were not shown as recipients of copies on these emails. S-72; N.T. at 505:9-25.

N.S.'s mother contacted Woodlynde after the May IEP meeting. She was eventually put into contact with Ms. Tabun, received information about the private school, and visited and toured Woodlynde over the summer. HOD at ¶ 87; N.T. at 117:9-15, 158:9-17. In June, the parents provided the information Woodlynde requested. N.T. at 159:11-23. The parents received an acceptance letter from Woodlynde in early July. HOD at ¶ 88. On July 10, 2018, the parents' attorney notified Colonial's attorney that N.S. had been accepted into Woodlynde. HOD at ¶ 89. Upon hearing this news, Ms. Chasen requested Woodlynde to send an acceptance letter to Colonial. N.T. at 507:13-17.

---

[16]     In mid-May 2018, N.S.'s mother signed a release permitting Colonial to send various documents and records to Woodlynde. S-72 at 1-2.

[17]     The hearing officer found that Ms. Chasen referred N.S. to Woodlynde on June 13, 2018. HOD at ¶ 85. The Court clarifies that the recommendation letter was dated June 13, 2018. *Id.* The "referral" itself was initiated when Ms. Chasen sent the initial email on May 17, 2018.

In the meantime, after learning that N.S. was accepted into Woodlynde, the parents filled out enrollment paperwork, communicated with Woodlynde's enrollment team, and paid a deposit to secure N.S.'s admission at Woodlynde. HOD at ¶ 88; N.T. at 118:22-119:20. The paperwork included Woodlynde's tuition insurance agreement in the event N.S. did not enroll at Woodlynde, which N.S.'s father signed. P-18 at 2. The parents made a payment after receiving "increased pressure from Woodlynde" to complete the paperwork and put down a deposit in order to hold N.S.'s place. N.T. at 118:22-119:20; P-18. In doing so, the parents incurred a $37.43 convenience fee charge for using a credit card to pay the deposit and paid $748.58 for Woodlynde's insurance. P-18 at 4. Colonial has not reimbursed the parents for this $786.01 expense. HOD at ¶ 90.

Woodlynde sent Colonial a letter on August 8, 2018 confirming N.S.'s acceptance. HOD at ¶ 91. The following day, Ms. Chasen sent the parents a NOREP form proposing N.S.'s full-time placement at Woodlynde. HOD at ¶ 93; S-65. The letter accompanying the NOREP form stated that "Colonial School District has agreed to assume the financial responsibility for Nadia's educational program at the Woodlynde School." S-65 at 1. The letter did not state whether Colonial would be invoiced directly or would reimburse the parents for past and future costs already incurred. Id. Colonial did not communicate with the parents during the time period between the May IEP team meeting and this letter and NOREP form. HOD at ¶ 92. The parents timely signed the NOREP form. HOD at ¶ 94. Colonial was provided its first invoice from Woodlynde in September 2018. HOD at ¶ 95.

In general, if Colonial knows that it is placing students in another setting for the following school year, it "always offer[s]" to place that student in the new school's summer program to ease the student's transition. N.T. at 542:7-19. Understandably, Colonial only does so if it is aware of the new placement prior to the beginning of summer. Id. During the May 2018 IEP meeting, the

IEP team discussed enrolling N.S. into Woodlynde's summer program in the event Woodlynde accepted her before the school year ended. N.T. at 542:7-11.

N.S. began the 2018-2019 school year enrolled at Woodlynde. Although N.S. had a few disciplinary incidents, overall, she became acclimated to her new placement and created positive relationships with teachers and peers by December 2018. HOD at ¶ 101. N.S. did not exhibit anxiety over attending Woodlynde. HOD at ¶ 102.

## II.     Procedural History

In August 2018, N.S.'s parents filed a due process complaint against Colonial. The hearing officer conducted three days of hearings and heard oral argument. At the due process hearing, the parents asserted that Colonial's special education programs during the 2017-2017 and 2017-2018 school years and its delay in proposing placement for the 2018-2019 school year at Woodlynde denied N.S. a FAPE. Colonial contended that its special education program, as offered and implemented, was appropriate for N.S. at the time.

In her December 31, 2018 decision, the hearing officer determined that Colonial denied N.S. a FAPE from March 16, 2017 to the end of that school year and throughout the entirety of the 2017-2018 school year. The hearing officer faulted Colonial for not providing N.S. a positive behavior support plan starting in mid-March 2017. Without a positive behavior support plan in place, the hearing officer determined that the informal behavior plan Colonial did use—a "behavior chart that was not maintained or even monitored for efficacy"—was inadequate. HOD at p. 22. Colonial also refrained from developing a positive behavior support plan during the following school year. The hearing officer determined that Colonial's decision to delay making any meaningful revisions to N.S.'s special education program from March 2017 until the end of

the 2017-2018 school year, in light of N.S.'s unique needs and circumstances, amounted to a denial of a FAPE.

With N.S.'s reevaluation in hand as early as January 2018, Colonial decided it would apparently be best to wait until it received Dr. Goldstein's supplemental evaluation in May 2018 before modifying N.S.'s program in any way. The hearing officer, however, held that Dr. Goldstein's supplemental evaluation was not completed within 60 days as is required pursuant to 22 Pa. Code. § 14.124(b). She also determined that Colonial failed to issue NOREP forms when N.S.'s IEPs were revised in November 2017 and May 2018.

Accordingly, the hearing officer awarded N.S. two compensatory education hours per day for each day Colonial was in session during the time period in which it denied N.S. a FAPE. She also opined that N.S. should receive an additional 60 hours of compensatory education to account for N.S. not attending Woodlynde's summer program to ease her transition.[18] Although Colonial, on its own, agreed to pay for N.S.'s enrollment at Woodlynde for the 2018-2019 school year, it refused to reimburse the parents for additional expenses they incurred in securing N.S.'s place at Woodlynde. The hearing officer ordered Colonial to reimburse the parents for these $786.01 in expenses.

Colonial then brought this suit to challenge the hearing officer's rulings. Colonial initially brought this suit against N.S., N.S.'s parents, and Woodlynde but has since voluntarily dismissed Woodlynde. The parents did not bring any counterclaims. Neither party requested the administrative record to be supplemented with additional evidence. Both parties now move for judgment on the administrative record.

---

[18] Although the hearing officer did not actually include these 60 hours in her order, she referenced granting them in her memorandum opinion. HOD at p. 26.

15

A district court has jurisdiction to review the findings and decision of a state education agency under 20 U.S.C. § 1415(i)(2). *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). The party seeking relief (here, Colonial) bears the burden of persuasion before the district court. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012); *see E.D. v. Colonial Sch. Dist.*, No. 09-4837, 2017 WL 1207919, at *11 (E.D. Pa. Mar. 31, 2017) ("The burden lies with Plaintiffs to show that [the student] was denied a FAPE since they are the ones that are challenging the administrative decision.").

Under the IDEA, a district court must make its own findings by a preponderance of the evidence. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (citing 20 U.S.C. § 1415(i)(2)(B)(iii)). However, the reviewing district court "is obliged to conduct a modified de novo review, giving 'due weight' to the underlying administrative proceedings." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (citations omitted). Under this standard, "[f]actual findings from the administrative proceedings are to be considered *prima facie* correct[.]" *Id.* (citation omitted); *see D.S.*, 602 F.3d at 564. Courts should defer to the hearing officer's factual findings unless it can point to contrary non-testimonial evidence in the record to support its conclusions. *Tyler W. v. Upper Perkiomen Sch. Dist.*, 963 F. Supp. 2d 427, 432 (E.D. Pa. 2013). If, based upon the record, the reviewing court does not adhere to the hearing officer's factual findings, "it is obliged to explain why." *D.S.*, 602 F.3d at 564 (internal quotation marks omitted). A district court exercises *de novo* review over legal conclusions found in the administrative proceedings. *Id.*

Colonial claims that that the hearing officer erred in determining that Colonial failed to provide N.S. a FAPE from March 2017 through the end of the 2017-2018 school year. The parents contend that Colonial failed to procedurally and substantively provide N.S. a FAPE, as required by the IDEA, at the very least, during the entirety of the 2016-2017 and 2017-2018 school years.[19] The Court considers whether Colonial denied N.S. a FAPE by: (1) failing to issue NOREP forms in conjunction with the November 2017 and May 2018 IEPs; (2) failing to issue final IEPs in November 2017 and May 2018; (3) the untimely issuance of the psychiatric evaluation report; and (4) failing to address N.S.'s behavioral problems in a systematic and continuous way.

## I. Statutory IDEA Framework

The Individuals with Disabilities Education Act reflects an "ambitious federal effort . . . passed in response to Congress' perception that a majority of handicapped children in the United States were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to drop out." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist, Westchester Cty. v. Rowley*, 458 U.S. 176, 179 (1982) (internal quotation marks omitted). Under the IDEA, states receiving federal educational assistance must establish "policies and procedures" to ensure a "free appropriate public education" (FAPE) for all children with

---

[19] At oral argument, the parents then argued that Colonial should have known to place N.S. at Woodlynde as early as October 2015, when it completed N.S.'s initial evaluation. On a preliminary note, the parents did not bring any counterclaims to challenge the hearing officer's determination.

Regardless, the Court's analysis focuses on whether an IEP is *reasonable*, not whether the Court itself finds the IEP to be the best plan, much less ideal. *K.D. v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018) (quoting *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017)). As noted, the initial IEP issued in October 2015 put in place various measures and goals based on the initial evaluation. It was not until N.S.'s behavioral issues continued, even with these measures in place, that it became apparent that more action, such as implementing a positive behavior support plan or placement at a private school, was needed. As discussed below, the Court agrees with the hearing officer's determination that the earliest Colonial knew or reasonably should have known that N.S.'s IEP was inadequate starting on March 16, 2017, not earlier.

disabilities. 20 U.S.C. § 1412(a)(1)(A); *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012). In the context of the IDEA, "'education' extends beyond discrete academic skills and includes the social, emotional, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential." *M.M. v. Penn Manor Sch. Dist.*, No. 12-3646, 2015 WL 221086, at *4 (E.D. Pa. Jan. 14, 2015). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction. *Rowley*, 458 U.S. at 188-89.

"School districts provide a FAPE by designing and administering a program of individualized instruction that is set forth in an Individualized Education Plan ('IEP')." *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 240 (3d Cir. 2009) (citing 20 U.S.C. § 1414(d)). The IEP includes, *inter alia*, a statement of the child's present levels of academic achievement and functional performance; a statement of measurable, annual goals, including academic and functional goals; and a statement of how the child's progress toward the annual goals will be measured. *See* 20 U.S.C. § 1414(d)(1)(A)(i). The purpose of the IEP is to establish a plan for the academic and functional advancement of the child in light of that child's particular circumstances. *See Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).

The IEP "must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *Id.* at 1000 (quotation marks and citations omitted). Although a school district is not required to maximize a child's potential, it is insufficient under the IDEA for a school district to provide merely more than a trivial educational benefit to students. *See D.S.*, 602 F.3d at 556; *S.H.*, 336 F.3d at 271 ("The IDEA does not require the School District to provide [a student] with the best possible education."). "[A]n

educational program must be appropriately ambitious in light of [the child's] circumstances" and "every child should have the chance to meet challenging objectives[,]" especially where the child is not "fully integrated into the regular classroom." *Endrew F.*, 137 S. Ct. at 1000.

"The issue of whether an IEP is appropriate is a question of fact." *D.S.*, 602 F.3d at 564 (internal quotation marks and citations omitted). "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *K.D. v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018) (quoting *Endrew F.*, 137 S. Ct. at 999) (emphasis in original). A court may "consider [a child's] school progress in evaluating the appropriateness of the IEP . . . in determining whether the . . . IEP was reasonably calculated to afford some educational benefit." *D.S.*, 602 F.3d at 567 (citing *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993)). However, an IEP need not necessarily aim for grade-level placement." *Endrew F.*, 137 S. Ct. at 1000; *see K.D*, 904 F.3d at 255. "[T]he measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." *Fuhrmann*, 993 F.2d at 1040.

For a procedural violation to justify compensatory education or tuition reimbursement, the parents must prove by a preponderance of the evidence that "procedural inadequacies (i) [i]mpeded the child's right to a FAPE, (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66-67 (3d Cir. 2010) (quoting 34 C.F.R. § 300.513(a)(2)).

## II. Whether Colonial Failed to Issue NOREP Forms in Conjunction with the November 2017 and May 2018 IEPs

School districts in Pennsylvania are required to provide parents a NOREP form anytime they propose or refuse to initiate or change "the identification, evaluation, or educational

placement of the child, or the provision of a [FAPE] to the child." 20 U.S.C. § 1415(b)(3). "[T]he question of what constitutes a change in educational placement is, necessarily, fact specific . . . . Thus, in determining whether given modification in a child's school day should be considered a 'change in education placement', we should focus on the importance of the particular modification involved." *DeLeon v. Susquehanna Comm. Sch. Dist.*, 747 F.2d 149, 153 (3d Cir. 1984) (citations omitted). "[O]nly matters that will significantly impact the child's learning should be considered a change in educational placement for the purposes of the IDEA." *J.S. v. Lenape Reg'l High Sch. Dist. Bd. of Educ.*, 102 F. Supp. 2d 540, 544 (D.N.J. 2000).

The hearing officer found that Colonial's decision to refrain from issuing NOREP forms in conjunction with the November 2017 and May 2018 IEPs amounted to an actionable procedural violation of the IDEA. The parents argue that Colonial was required to issue NOREP forms alongside the November 2017 and May 2018 IEPs because they referenced an understanding that a non-specified private school would best meet N.S.'s needs. As Colonial points out, the November 2017 and May 2018 IEPs did not actually propose a change to N.S.'s educational placement. Rather, the IEPs signaled a future change to N.S.'s educational placement that had yet to be specifically proposed or otherwise finalized. According to Colonial, it was not required to issue a NOREP form until August 2018 when it actually (and finally) proposed N.S.'s placement at a private school. In another matter before a different hearing officer, Colonial had actually been *faulted* for issuing a NOREP form detailing a proposed placement at a specific private before the private school actually accepted that student. *See Colonial Sch. Dist. v. E.G.*, No. 19-1173 (Doc. No. 1 at 43-44), *aff'd*, 2020 WL 529906 (E.D. Pa. Jan. 31, 2020).

The Court agrees with Colonial that communicating the possibility of a future change to N.S.'s educational placement in the November 2017 and May 2018 IEPS did not require the

issuance of NOREP forms. As noted, a change in education placement focuses on the significance of the modification involved. Here, no modification was made to N.S.'s educational placement in November 2017 and May 2018. Rather, Colonial did not propose a change to N.S.'s placement until August 2018. Accordingly, the Court finds that the hearing officer erred in determining that Colonial's failure to issue NOREP forms in November 2017 and May 2018 resulted in a procedural violation of the IDEA.

### III.    Whether Colonial Failed to Issue Final IEPs in November 2017 and May 2018

The parents argue that Colonial must have failed to implement the finalized November 2017 and May 2018 IEPS because they have "DRAFT V2" markings on them.[20] The parents contend that this purported failure amounted to an actionable procedural violation of the IDEA. Typically, an IEP draft is used before and during the IEP meeting and is replaced with an updated IEP after the meeting. According to a Colonial official's testimony, the IEP-generating computer program improperly labeled "final" IEPS as "draft" IEPs. N.T. at 554:10-555:5. Concerning the November 2017 IEP, the official testified that although the document said "draft," she knew that it was actually the final IEP because it included language added after the IEP meetings took place. *Id.* The May 2018 document similarly references an agreement made at the IEP meeting held in May 2018, demonstrating that this version was indeed the updated, final version of the IEP. S-62A at 1. The fact that the markings state "DRAFT V2"—as opposed to "DRAFT V1"—also demonstrates that the documents were more likely than not the final, implemented versions of the IEPs.

The parents cite *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755 (6th Cir. 2001), a case in which the Sixth Circuit Court of Appeals held that creating only a "draft" IEP did not satisfy the

---

[20]    The hearing officer did not opine on this argument. For the sake of thoroughness, the Court considers, and rejects, the parents' argument.

IDEA. *Id.* at 766-67. In referencing this case, the Third Circuit Court of Appeals has noted that "central to the Sixth Circuit's analysis was the fact that the school district there never convened an IEP meeting, either before or after the start of the school year, and that the disabled student enrolled in the district for the school year and never received an IEP." *C.H.*, 606 F.3d at 69. Unlike the school district in *Knable*, Colonial convened multiple IEP meetings and created updated versions of the IEPs after the meetings took place. Therefore, the Court finds that Colonial did not err in implementing final versions of the November 2017 and May 2018 IEPs.

**IV.    Whether the Psychiatric Evaluation Report was Untimely**[21]

The hearing officer determined, and the parents contend, that Colonial denied N.S. a FAPE by taking approximately five months, instead of a maximum of 60 days, to conduct N.S.'s reevaluation in its entirety. Not counting the summer months between school years, Pennsylvania regulations afford school districts 60 days from the date in which it receives parental consent to complete a student's reevaluation. *Brandywine Heights Area Sch. Dist. v. B.M.*, 248 F. Supp. 3d 618, 622 (E.D. Pa. 2017) (citing 22 Pa. Code § 14.124(b)).

The IDEA requires school districts to conduct reevaluations in accordance with §§ 300.304 through 300.311 of the IDEA. 34 C.F.R. § 300.303. In conducting a reevaluation, "the public agency must . . . [u]se a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child . . . that may assist in determining . . . [t]he content of the child's IEP." 34 C.F.R. § 300.304(b)(1)(ii). "Assessments and other [re]evaluation materials include those tailored to assess specific areas of educational need," *Id.* at § 300.304(c)(1)(v), and must assess the student "in all areas related to the suspected disability,

---

[21]    Although the Court, in following the organization of the hearing officer's decision, addresses the delay in the issuance of Dr. Goldstein's psychiatric report on its own, it notes that this delay is pertinent to Colonial's failure to systematically and continuously address N.S.'s behavioral concerns during the 2017-2018 school year. *See infra* section V.B.

including, if appropriate, . . . social and emotional status," *id.* at § 300.304(c)(4). The reevaluation must be "sufficiently comprehensive to identify all of the child's special education and related service needs[.]" *Id.* at § 300.304(c)(6). Notably, the IDEA's plain language makes clear that reevaluations are used to determine "appropriate educational program[s.]" *Id.* at § 300.304(b)(2).

Here, Colonial received the parents' written consent to conduct a reevaluation on November 27, 2017. On December 1, 2017, Colonial then requested additional, separate consent for permission "to conduct a psychiatric evaluation for the purpose of planning an appropriate educational program." S-53 at 2. N.S.'s mother consented to the psychiatric evaluation on December 7, 2017. Colonial's school psychologist circulated her reevaluation report on January 25, 2018, within the 60-day time period. However, the private psychiatrist selected by Colonial to complete the additional psychiatric evaluation, Dr. Goldstein, did not circulate her report until sometime in May 2018. At issue is whether Pennsylvania's 60-day statutory maximum for conducting reevaluations applies to Dr. Goldstein's supplemental psychiatric evaluation report.

Colonial argues that Pennsylvania's regulatory 60-day maximum does not apply to the psychiatric evaluation. First, Colonial contends that Pennsylvania's 60-day maximum cannot apply to the psychiatric evaluation because its creator is a private psychiatrist not employed by the school district. Second, Colonial purports that the psychiatric evaluation was simply an evaluative "medical service" provided as a "related service" under the IDEA, not a reevaluation. *See* 20 U.S.C. § 1401(26)(A). Although the Court is not unmindful that the sheer volume of the demands for substantive services of the sort needed here may sometimes lead to the need to be rational about the imposition of deadlines, no such circumstances appear to be at play here. Hence, both arguments fail.

The record demonstrates that Colonial utilized Dr. Goldstein's evaluation as a means to collect information that could have and should have been assessed as a part of N.S.'s reevaluation. For instance, when requesting the parents' consent for the psychiatric evaluation, a Colonial official told the parents that it would be used to determine an "appropriate educational program" for N.S. S-53 at 2. As noted, *evaluations and reevaluations* are conducted to determine "appropriate educational program[s]" for students, not supplemental psychiatric evaluations with indefinite due dates. 34 C.F.R. § 300.304(b)(2). Furthermore, with the school psychologist's reevaluation in hand as early as January 25, 2018, Colonial should have promptly scheduled an IEP team meeting to appropriately revise N.S.'s IEP to reflect her reevaluation results. *See* 34 C.F.R. § 300.324(b)(ii)(B); *see infra* section V.B. Indeed, the parents were informed that the reevaluation was intended "to determine [N.S.]'s current academic, behavioral, executive functioning, and emotional needs to assist the team in planning for all aspects of her education." S-48 at 1. Evaluations and reevaluations are, after all, the analytical tools apparently deemed useful to the school district and are intended to be used to comprehensively assess a child's social and emotional status and other relevant functional information to determine what is necessary to provide a FAPE to the child. Colonial, however, did not reconvene the IEP team until it finally received Dr. Goldstein's psychiatric evaluation report in May 2018. If the reevaluation report and psychiatric evaluation report were as important and distinct as Colonial insists, it ought not have waited for the psychiatric evaluation report to modify N.S.'s IEP in light of the reevaluation report. As the parents fittingly pointed out at oral argument, "[t]he school district can[not] just wait for additional evidence or additional information indefinitely." Oral Argument Tr. at 24:13-15.

Albeit called by another name, Colonial effectively treated the supplemental psychological evaluation as an extension of the reevaluation. Colonial's proposition that it can take an indefinite

amount of time to determine an appropriate placement for N.S. by outsourcing its work[22] and calling the evaluation and accompanying report by a different name flies in the face of the intended purpose behind the regulatory timelines. When a school district knows or should reasonably know that a student's behaviors, ineffectively addressed by the IEP in place, impedes that student's opportunity to receive a meaningful educational benefit, it ought to rectify the IEP's inadequacies in a timely fashion. Colonial did not do so here and, more to the point, made no effort to tender a reason it did not. Colonial's insistence that the substantial length of the delay does not matter because the psychiatric evaluation report was useful misses the point.

Furthermore, Colonial's attempt to categorize the psychiatric evaluation report as a "related service" is of no moment. Indeed, a reevaluation could also easily be labeled as an evaluative medical service "as may be required to assist a child for a disability to benefit from special education." 20 U.S.C. § 1401(26)(A). Such a generalized categorization ought not allow a school district to circumvent more specific regulatory language. On its face, the 60-day period is not an unreasonable one, absent case-specific circumstances to the contrary. Notably, Colonial failed to point to a single case that suggests that utilizing a supplemental psychiatric evaluation to determine a student's appropriate educational placement, in lieu of a revaluation, is proper or extends the deadlines.

Colonial purports that it could not have and should not have modified N.S.'s placement or other IEP provisions in anyway during the 2017-2018 school year until it received the psychiatric evaluation report. As discussed more below, such a length period of inactivity ultimately resulted

---

[22] To be sure, 22 Pa. Code § 14.124(a) explains that "[t]he group of qualified professionals" assessing the child during a reevaluation "shall include a certified school psychologist when evaluating a child for . . . other health impairment [and] specific learning disability." It does not, however, provide any exception to the temporal maximum if a private psychiatrist is among the qualified professionals in the mix.

in a failure to address N.S.'s "behavioral problems in a systematic and consistent way." *Lauren P. v. Wissahickon Sch. Dist.*, 310 F. App'x 552, 554-55 (3d Cir. 2009).[23]

## V. Whether Colonial Failed to Address N.S.'s Behavioral Concerns in a Systematic and Consistent Way[24]

Colonial argues that the hearing officer erred in concluding that it substantively denied N.S. a FAPE from March 16, 2017 to the end of the 2016-2017 school year and throughout the entirety of the 2017-2018 school year. At issue is whether N.S.'s special education was "reasonably calculated to enable [N.S.] to receive meaningful educational benefits in light of [her] intellectual potential." *Endrew F.*, 137 S. Ct. at 1000.

A school district denies a student a FAPE if it fails to address the student's "behavioral problems in a systematic and consistent way." *Lauren P.*, 310 F. App'x at 554-55; *see also Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1029 (8th Cir. 2003) (holding that although student had made some progress, "any slight benefit was lost due to behavior problems that went unchecked" and unaddressed by the school). Particularly relevant here, a school's failure to develop a positive behavior support plan can result in the denial of a FAPE. *G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455, 467 (E.D. Pa. 2011) (finding that the school district's failure to convene an IEP team meeting and "develop an IEP with a Positive Behavior Support Plan" resulted in the denial of a

---

[23] Even if, assuming arguendo, the Court did not find the 60-day maximum to apply to the supplemental report, surely the five-month delay exacerbated the failure to appropriately address N.S.'s behavioral needs.

[24] As a preliminary note, the parents inappropriately focus on N.S.'s failure to make meaningful educational progress, particularly her failure to advance with her grade-level and meet IEP goals, instead of focusing on whether Colonial failed to appropriately revise its programs to meet N.S.'s needs. "Rather than presuming grade-level advancement, the [IDEA] requires revisions to education programs *'as appropriate* to address any lack of expected progress towards the annual goals and in the general education curriculum, *where appropriate.*" *K.D.*, 904 F.3d at 255 (quoting 20 U.S.C. § 1414(d)(4)(A)(ii). (ii)(I)) (emphasis in original). "To suggest that 'failure to attain IEP objectives equals an IDEA violation is to set the bar on special education far too high." *L.R. v. Manheim Twp. Sch. Dist.*, 540 F. Supp. 2d 603, 619-20 (E.D. Pa. 2008). Accordingly, the Court instead focuses on whether N.S.'s IEPs were reasonably modified to address N.S.'s needs.

FAPE); *see also Penn Trafford Sch. Dist. v. C.F.*, No. 04-1395, 2006 WL 840334, at *8 (W.D. Pa. March 28, 2006) (finding the failure to "provide a behavior management plan" through the IEP "a serious omission").

## A. The 2016-2017 School Year (Fourth Grade)

The Court first considers whether Colonial denied N.S. a FAPE during the end of the 2016-2017 school year. By mid-March 2017, it was clear that N.S. "was engaging in increasingly alarming behaviors that were not age-appropriate." HOD at p. 21. N.S.'s documented and serious anxiety over going to school, inability to maintain focus, and other behavioral concerns were also apparent and concerning. Given these observations, it was certainly clear by March 2017 that the initiatives Colonial had in place were not enough to adequately address N.S.'s exhibited behavioral issues. Colonial contends that in March 2017, it "sought, and [the] parents refused, permission to conduct a reevaluation that included a functional behavioral assessment." Colonial's Mem. in Supp. of Mot. at 20-21 (Doc. No. 16-2). Colonial reasoned that without the required parental consent to conduct the functional behavioral assessment, it could not put into action a positive behavior support plan to better address N.S.'s mounting behavioral needs.

Federal law requires IEP teams to consider the use of positive behavioral interventions and supports where a child's behavior impedes their learning or the leaning of others. 20 U.S.C. § 1414(d)(3)(B); 34 C.F.R. § 300.324(a)(2)(i); *see Jalen Z. v. Sch. Dist. of Phila.*, 104 F. Supp. 3d 660, 670 (E.D. Pa. 2015) (noting that the IDEA generally requires a functional behavioral analysis "when a child has been identified with a disability and has an IEP in place, yet still displays behavioral problems") (quoting *D.K. v. Abington Sch. Dist.*, No. 08-4914, 2010 WL 1223596, at *9 (E.D. Pa. Mar. 25, 2010), *aff'd*, 696 F.3d 223 (3d Cir. 2012)).

Under Pennsylvania regulations, "positive behavior support plans" are developed "for students with disabilities . . . who require specific intervention to address behavior that interferes with leaning." 22 Pa. Code § 14.133(b). The plan "must include methods that utilize positive reinforcement and other positive techniques to shape a student's . . . behavior, ranging from the use of positive verbal statements as a reward for good behavior to specific tangible rewards." *Id.* Notably, an IEP team *must* base the positive behavior support plan on what is known as a "functional behavioral assessment" and incorporate the positive behavior support plan into the student's IEP. *Id.* Because Colonial had to collect additional data to perform the functional behavioral assessment, it was required to receive explicit parental consent. 34 C.F.R. § 300.300; *see, e.g., G.L. v. Saucon Valley Sch. Dist.*, 267 F. Supp. 3d 586, 592 (E.D. Pa. 2017) ("[T]he School District issued a Permission to Reevaluate consent form to conduct a comprehensive assessment including a Functional Behavioral Assessment ("FBA").").[25] Indeed, Colonial agrees that obtaining parental consent to conduct a functional behavioral assessment was necessary.

Here, Colonial is correct in that it could not have developed a positive behavior support plan without obtaining the requisite parental consent to conduct the functional behavioral assessment. However, Colonial's argument ultimately fails because it never requested the parental consent that it itself acknowledges was absolutely required.[26] Accordingly, Colonial failed to take the steps necessary to attempt to create a necessary positive behavior support plan, regardless of

---

[25]  Accordingly, the hearing officer erred in determining that Colonial should have developed a formal positive behavior support plan with or without parental consent during the 2016-2017 school year. HOD at p. 21-22. Even so, the hearing officer was ultimately not wrong to conclude that Colonial denied N.S. a FAPE beginning in March of 2017.

[26]  The form requesting parental consent disclosed that the proposed reevaluation would consist only of "achievement testing, parent and teacher input forms, behavior rating scales and classroom observations." S-24 at 2. *See also* Oral Argument Tr. at 32:24-33:2 (noting that the functional behavioral assessment "was not on the table for the parents").

whether or not the parents consented to the March 2017 reevaluation. Even if the parents did consent to the March 2017 reevaluation, a positive behavior support plan could still not be developed as a result of the reevaluation absent obtaining the parental consent necessary to perform the functional behavioral assessment.

Without a positive behavior support plan in place, the hearing officer determined that N.S.'s informal "motivational behavior plan" and Colonial's programming failed to meet N.S.'s needs. During the 2016-2017 school year, N.S.'s "motivational behavior plan" consisted of a behavioral chart tallying "points" for good behavior. Because the chart was kept on a dry-erase board, N.S.'s "points" earned for appropriate behavior were erased daily and, therefore, could not be monitored for efficacy. N.S. also participated in a "lunch bunch" program, small group social skills program, a general class-wide behavioral program, and a general school-wide behavioral program. These initiatives, which N.S. already participated in prior to March 2017, were never modified, even after Colonial expressed continued or new concerns over N.S.'s behavior. The Court agrees with the hearing officer that Colonial's faulty response is documented by the district's relying exclusively on these informal behavioral initiatives instead of attempting to put in place a positive behavior support plan based on a functional behavioral assessment. Accordingly, the Court finds that despite knowing that N.S.'s IEP was inadequate by March 16, 2017, the date by which Colonial failed to properly request parental consent to perform a functional behavioral assessment, Colonial failed to reasonably modify N.S.'s inadequate IEP from that date to the end of the 2016-2017 school year.

**B. 2017-2018 School Year (Fifth Grade)**

Next, the Court considers whether Colonial denied N.S. a FAPE during the 2017-2018 school year. Without a positive behavior support plan in place and with Colonial relying on nearly

the same behavioral chart[27] and programming, N.S. continued exhibiting problematic behaviors, in some cases, more alarming during the fall of the 2017-2018 school year. In particular, N.S. wrote that she wanted to kill herself on the white board in her learning support classroom in early November 2017.

That same month, N.S.'s IEP team met and proposed another IEP which mainly mimicked the IEPs before it. For the first time, however, the IEP team also discussed the possibility of private school placement. After the IEP team met, Colonial requested to reevaluate N.S., this time properly requesting parental consent to perform a functional behavioral assessment. As noted, this reevaluation was intended to conduct a comprehensive analysis for the IEP team to use "in planning for all aspects of [N.S]'s education." S-48 at 1. Colonial first received parental consent to perform this reevaluation on November 27, 2017. As noted, Colonial then requested parental consent for Dr. Goldstein to conduct the psychiatric evaluation for purposes of planning an appropriate educational program for N.S. S-53 at 2.

Colonial's school psychologist timely issued her reevaluation report on January 25, 2018. In the reevaluation report, the school psychologist made many recommendations, including a change of placement, putting in place a positive behavior support plan, counseling, increased support for N.S., and small class sizes with a smaller student-to-teacher ratio. Despite having the reevaluation report in hand, the parents' attempts to contact Colonial from January to March, and the IDEA's directive to revise an IEP, as appropriate, to address the results of a reevaluation, 34 C.F.R. § 300.324, Colonial did not convene an IEP meeting to discuss implementing any of the recommendations set forth in the reevaluation report until May 2018. Despite being able to implement a positive behavior support plan, Colonial refrained from doing so.

---

[27] During the 2017-2018 school year, Colonial switched to a paper chart to record N.S.'s "points."

30

As noted, Colonial explains its inaction by insisting that it was waiting on Dr. Goldstein's supplemental evaluation before conducting an IEP meeting. But even after the IEP team met in May 2018, N.S.'s IEP *still* did not put into place a positive behavior support plan. To the extent Colonial argues that doing so would be unnecessary once the team discussed N.S.'s private placement at Woodlynde, such an argument again fails. Before a school district places or refers a student to a private school, it still must conduct a team meeting to develop an IEP *in accordance with the IDEA.* 34 C.F.R. § 300.325. Moreover, given the growing delay in the issuance of the psychiatric evaluation report, it would have certainly been reasonable to develop a positive behavior support plan during the extensive interim period. Colonial denied N.S. a FAPE once it reasonably knew that N.S.'s IEP failed to address her behavioral problems in a systematic and continuous way yet refrained from making *any* meaningful modifications between March 2017 and August 2018 when it proposed placement at Woodlynde.

Therefore, the Court affirms the hearing officer's determination that N.S. was substantively denied a FAPE from March 16, 2017 for the remainder of the 2016-2017 school year and for the entirety of the 2017-2018 school year.

## VI. Remedies

"The IDEA grants a district court reviewing an IDEA claim the authority to grant whatever relief it 'determines is appropriate[]'" based on the preponderance of the evidence. *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 496 (3d Cir. 2012) (quoting 20 U.S.C. § 1415(i)(2)); *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014). "These remedies include, *inter alia*, 'attorneys' fees, reimbursement for a private educational placement, and compensatory education.'" *Batchelor*, 759 F.3d at 272 (quoting *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 185 (3d Cir. 2009)). Because the Court finds that N.S. was

denied a FAPE, it addresses whether awarding compensatory education hours, reimbursement for expenses related to N.S.'s enrollment at Woodlynde, and reasonable attorney's fees would be appropriate here.

## A. Compensatory Education Hours

The hearing officer awarded N.S. compensatory education amounting to two hours per day for each day Colonial was in session from March 16, 2017 through the end of the 2016-2017 school year, and two hours per day for each day Colonial was in session during the entirety of the 2017-2018 school year. Reasoning that N.S. could have attended Woodlynde's summer program if not for Colonial's inaction, she also awarded 60 additional hours.[28]

Where a district court determines that a school district failed to provide a student a FAPE as required under the IDEA, it may award relief in the form of compensatory education. *Mary T.*, 575 F.3d at 249 (3d Cir. 2009); *see M.C. v. Central Reg'l Sch. Dist.*, 81 F.3d 389, 396 (3d Cir. 1996) (holding that a plaintiff is entitled to compensatory education if the student's "IEP fails to confer some (i.e., more than *de minimus*) educational benefit to a student"). Compensatory education is a judicially created remedy undefined by the IDEA. *See Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 717 (3d Cir. 2010). Compensatory education is awarded to compensate for the period of time in which a student was deprived of his or her right to a FAPE. *See Mary T.*, 575 F.3d at 249; *see M.C.*, 81 F.3d at 395 (noting that compensatory education is intended to require "school districts to 'belatedly pay expenses that [they] should have paid all along.'") (quoting *Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir. 1986)). The right to compensatory education "accrue[s] from the point that the school district knows or should know of the IEP's failure." *Mary*

---

[28] As noted, although the hearing officer noted this award in her written decision, she, presumably inadvertently, omitted the additional 60-hour award in her order. The 60 hours is based on an estimate that N.S. should be awarded two hours of compensatory education per day for a 30-day summer program. HOD at p. 26.

*T.*, 575 F.3d at 249 (quoting *M.C.*, 81 F.3d at 396). In calculating compensatory education, the "disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem." *Id.*

The parents request the Court to increase the compensatory education award to two hours per day for the entirety of both the 2016-2017 and 2017-2018 school years. Colonial argues that the parents' request is improper because they never filed a counterclaim challenging the hearing officer's compensatory education determination. Because the Court finds that the hearing officer properly determined that Colonial should have known of the IEP's failure beginning on March 16, 2017, it rejects the parents' argument that compensatory education award should account for school days predating March 16, 2017. Therefore, the Court will not address the procedural challenge to their claim.

Instead, the Court, as it must, reviews the requested relief as it deems appropriate. *See D.F.*, 694 F.3d at 496. In doing so, it finds that the hearing officer's determination failed to exclude the time reasonably required for Colonial to rectify the problem. In following the Third Circuit Court of Appeal's guidance, the Court therefore excludes from the compensatory education award the reasonable amount of time in which Colonial could have incorporated, at the very least, a meaningful positive behavior support program into N.S.'s IEP before ultimately recommending N.S.'s placement at Woodlynde.

The Court reasons that, assuming Colonial properly requested parental consent to conduct a reevaluation consisting of a functional behavioral assessment on March 16, 2017, the parents could have reasonably provided written consent within 14 days. Pursuant to Pa. Code § 14.124(b), Colonial then would have had up to 60 days to perform its reevaluation consisting of a functional

behavioral assessment after receiving parental consent. The IEP team then could have reasonably met within 30 days after the completion of the reevaluation report.[29] Finally, the Court reasons that Colonial could have implemented a positive behavior support plan and other appropriate modifications within 14 days after the IEP team met.[30] Therefore, the Court finds that 118 calendar days should be excluded from the compensatory education award to account for the reasonable amount of time it would have taken Colonial to appropriately modify N.S's IEP before eventually referring her to Woodlynde.[31]

The Court does, however, find the hearing officer's award of two compensatory education hours per school day to be appropriate. "Parsing out the exact number of hours [a child] was not benefitted by FAPE during the time period 'would place an arduous and near impossible task upon the administrative bodies.'" *Damian J. v. Sch. Dist. of Phila.*, No. 06-3866, 2008 WL 191176, at *7 n. 16 (E.D. Pa. 2008) (awarding full days of compensatory education); *see G.D.*, 832 F. Supp. 2d at 468 (affirming hearing officer's "limited award of two hours of compensatory education for every day [the student] was denied a FAPE").

---

[29]    In determining when the IEP team should have met, the Court turns to 34 C.F.R. § 300.323 for guidance. That regulatory provision requires an IEP meeting to develop an initial IEP to be held within 30 days after the school district determines that a student needs special education and related services. 34 C.F.R. § 300.323(c)(1). Accordingly, 30 days should be more than enough time to revise an IEP to incorporate a positive behavior support plan and any other related modifications.

[30]    Again, the Court turns to 34 C.F.R. § 300.323. This provision provides that a school district must ensure that "[a]s soon as possible following development of the IEP, special education and related services are made available to the child in accordance with the child's IEP." 34 C.F.R. § 300.323(c)(2).

[31]    To be clear, the 118 days should be subtracted only from time in which Colonial was in session. This calculation excludes the summer months. For example, if only 100 calendar days remained from March 16, 2017 to the last school day of the 2016-2017 school year, the remaining 18 calendar days are to be subtracted from the beginning of the 2017-2018 school year, beginning on the first day of the 2017-2018 school year. After the 118 calendar days have been appropriately accounted for, Colonial is to provide compensatory education in the amount of two hours per day for each day Colonial was in session for the remainder of the time in which N.S. was denied a FAPE.

The Court does not however, affirm the hearing officer's award of an additional 60 hours of compensatory education to compensate for the time that N.S. did not attend Woodlynde's summer program. While it appears that when Colonial is made aware of a student's new placement, it "always offer[s]" to place that student in the new school's program to ease the student's transition, N.T. at 542:7-19, there is no regulatory demand for such an approach, laudatory as it may be. In the absence of any evidence that the Woodlynde summer program was central to its delivery of educational services, the Court does not find any compelling reason to add this component to the award. Likewise, although the IEP team discussed the possibility of summer placement during the May 2018 IEP meeting, there is no evidence that such a comment was determinative for the parents. In any event, summer placement was contingent upon Woodlynde's acceptance of N.S. before the end of the 2017-2018 school year. It is too speculative to assume that Woodlynde would have accepted N.S. in time if not for Colonial's delay in seeking an appropriate educational placement for N.S.

In sum, the Court awards compensatory education in the amount of two hours per day for each day Colonial was in session from March 16, 2017 through the end of the 2016-2017 school year and two hours per day for each day Colonial was in session during the entirety of the 2017-2018 school year *subtracted by the 118 calendar days reasonably necessary* for Colonial to remediate the denial of a FAPE. The Court declines the award of an additional 60 hours of compensatory education for Woodlynde's summer program.

## B. Reimbursement for Expenses Incurred to Ensure N.S.'s Placement at Woodlynde

Under the IDEA, FAPEs are to be provided "without charge." 34 C.F.R. § 300.17(a). "When a state fails to provide a [FAPE], it must reimburse parents for resulting private school costs." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006) (citing *T.R. v. Kingwood*

*Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000)). Federal courts have broad discretion in evaluating eligibility for reimbursement of private school placement expenses. *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 567 (E.D. Pa. 2013), *aff'd in part*, 581 F. App'x 141 (3d Cir. 2014) (citing *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246-47 (2009); *Florence Cty. Sch. Dist. Fourt v. Carter*, 510 U.S. 7, 15 (1993); *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985)).

Here, Colonial agreed to fund N.S.'s tuition to attend Woodlynde for the 2017-2018 school year. However, it contends that it need not have to reimburse the parents for related expenses the parents incurred in the process of confirming N.S.'s placement at Woodlynde. Faulting Colonial for not following up with Woodlynde throughout the summer, the hearing officer determined that Colonial should reimburse the parents for these related expenses culminating in $786.01.

Colonial argues that the parents should have known that Colonial, on its own, was to handle the referral to Woodlynde on the family's behalf. Colonial accuses the parents of instead "unilaterally applying" to Woodlynde, resulting in the parents incurring these additional fees. Col's Mem. in Supp. of Mot. at 33 (Doc. No. 16-2). Colonial claims that it was made clear that the parents were not to incur additional fees throughout the referral process. The Court disagrees.

On May 30, 2018, Ms. Tabun communicated to Ms. Chasen Woodlynde's agreement to move forward with N.S.'s application process. In doing so, Ms. Tabun communicated that she requested the remaining referral materials—the application, school records, and recommendation—directly from the family. The following day, Colonial's counsel relayed this message to the parents' attorney, adding:

> I'm confident Ms. Chasen has already contacted the family. *Nonetheless, kindly ask your clients to follow-up with Woodlynde to complete the process.*

S-63b at 1 (emphasis added). On June 1, Ms. Chasen responded to Ms. Tabun's email: "Since the District is making the referral, are there things we can do/provide to help facilitate this process?" S-72 at 3. After a few rounds of emails, it was communicated between Ms. Chasen and Ms. Tabun that Colonial would send only the recommendation and the school records. In May, the parents gave permission for Colonial to send N.S.'s school records to Woodlynde. Ms. Chasen sent Woodlynde a recommendation dated June 13, 2018. N.S.'s mother turned in the remaining materials in June. Woodlynde then sent an acceptance letter directly to the parents in early July. The parents' attorney notified Colonial's attorney of the acceptance letter on July 10, 2018. After finding out that N.S. was accepted, the parents received "increased pressure" from Woodlynde to guarantee N.S.'s spot by sending in paperwork and paying a deposit. In relevant part, N.S.'s father signed Woodlynde's tuition insurance agreement on July 20, 2018 and incurred a "convenience" charge when making an online payment to Woodlynde on August 8, 2018.

Colonial refrained from communicating with the parents. Instead, Colonial requested Woodlynde to send an additional acceptance letter to the school, which Woodlynde did on August 8, 2018. After receiving the additional acceptance letter, Colonial sent the parents a NOREP form proposing N.S.'s placement at Woodlynde on August 9, 2018. Without detailing any logistics, the letter accompanying the NOREP form communicated that Colonial would finance N.S.'s enrollment at Woodlynde.

Colonial insists that its agreement to make the referral, the parents' permission for Colonial to release N.S.'s school records, and the August 9, 2018 NOREP form made it clear that the parents were not to incur any out-of-pocket, reimbursable fees related to Woodlynde. Not so. The parents were instructed to turn in various materials directly to Woodlynde, and they complied. Woodlynde then sent the family the acceptance letter. Reasonably believing that N.S. would lose her place if

they were hasty, the parents, as requested by Woodlynde, turned in what they believed to be necessary paperwork and a deposit. Even after the parents' attorney notified Colonial's attorney of the acceptance letter, Colonial did not respond or in any way communicate with the parents until nearly a month later when it sent the NOREP form.

The evidence Colonial relies on misses the mark. First, Colonial points to evidence that suggests Colonial played a role in the initial referral process. This evidence shows that the parents, of course, also played a role in the process. Indeed, Colonial's attorney *instructed* the parents to participate in the referral process. Although it was clear that Colonial, undoubtedly, was involved in the process, that acknowledgement, on its own, did not reasonably inform the parents of the financial logistics regarding the referral. Second, Colonial points to the August 9, 2018 NOREP form. Notably, Colonial sent this NOREP form a day after N.S.'s father already paid for the expenses at issue, and weeks after he signed the tuition insurance contract on July 20, 2018. Even if the Court were to assume that Colonial clearly and timely communicated that it would pay for all of N.S.'s expenses relating to Woodlynde, the record shows no communications regarding details as to *how* Colonial would finance N.S.'s private school placement. Without any clear direction from Colonial, the parents could have very reasonably figured that Colonial would simply reimburse the parents for any out-of-pocket expenses.

Despite Colonial's lack of clarity communicated—which seems to have confused both the parents and the officials at Woodlynde—Colonial places all responsibility on the parents. Colonial purports that the parents could have avoided these expenses if only they reached out to Colonial about filling out the paperwork and paying the deposit. However, the situation could have been as easily avoided if Colonial alerted the parents in any meaningful way not to front any expenses. Colonial did not make any clarifying communications even after knowing that Woodlynde was

communicating directly with the family. The only clarity arising out of this situation is that *nothing* was clear between Colonial, Woodlynde, and the parents. Indeed, perhaps any party could have done something differently to avoid the situation at hand. However, it makes little sense to require the party with the least familiarity with the intricacies of the process to absorb the cost for this multi-party web of confusion. Accordingly, the Court affirms the hearing officer's determination that Colonial must reimburse the parents for the out-of-pocket expenses they incurred paying Woodlynde's convenience fee and tuition refund insurance.

### C. Reasonable Attorneys' Fees

The IDEA provides that a district court may, in its discretion, award "reasonable attorneys' fees" to a prevailing party. 20 U.S.C. § 1415(i)(3)(B)(i). Courts interpret this fee provision consistently with other federal statutes that use the term "prevailing party." *M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 224 (3d Cir. 2017) (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 n. 4 (2001)). Accordingly, to be deemed a prevailing party under the IDEA, a party must achieve a "material alteration of the legal relationship of the parties' that is 'judicially sanctioned.'" *Id.* (quoting *Raab v. City of Ocean City, N.J.*, 833 F.3d 286, 292 (3d Cir. 2016)). A party obtains a "'material alteration' of the parties' legal relationship and 'prevail[s]' for attorneys' fees purposes only if [s]he obtains relief that is 'in some way merit[s]-based.'" *Id.* (quoting *Raab*, 833 F.3d at 293). N.S. and her parents are deemed the "prevailing party" in this matter and are, therefore, eligible to recovery of reasonable attorneys' fees, having obtained an award of compensatory education and reimbursement of private school

related expenses. Accordingly, the Court permits them to proceed pursuant to Fed. R. Civ. P. 54(d)(2) with respect to reasonable attorneys' fees.[32]

CONCLUSION

As set forth in this Memorandum, the Court, having found that Colonial denied N.S. a FAPE beginning on March 16, 2017 and continuing to the end of the 2017-2018 school year, awards the parents appropriate compensatory education and expenses related to private school placement. Therefore, the Court grants in part and denies in part both motions and affirms in part and reverses in part the hearing officer's decision. An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

---

[32] The Court urges the parties to confer meaningfully with each other on this point in order to avoid incurring yet more legal fees attendant to this dispute. However, if they are unable to efficiently and economically resolve this remaining aspect, they should promptly contact the Court for assistance.